**ARMOUR & CO., Appellant, v. GLANDER, Appellee.**

Board of Tax Appeals.

No. 16296. Decided January 17, 1950.

Dargusch, Caren, Greek & King by John M. Caren, Columbus, for appellant.

Herbert S. Duffy, Atty. Genl., W. H. Annat, Asst. Atty. Genl., Columbus, for appellee.

**OPINION**

This is an appeal from a final order of the Tax Commissioner made on June 6, 1949, wherein an application for review and redetermination of a previous order made on May 12, 1949, was denied and the former order was permitted to stand unmodified. The cause now comes on for further and final consideration upon the Commissioner's transcript, the notice of appeal, the transcript of the evidence adduced at a hearing had before the Board and an attorney examiner on October 7, 1949, oral arguments and brief of counsel. The appeal concerns the validity of a tax assessment against appellant for the year 1946 as a freight line company under the provisions of §§5416, 5462 and 5468 GC, which tax the proportion of the capital stock of a freight line company represented by its transitory rolling stock owned and used in Ohio.

It is maintained that the Tax Commissioner erred in his order or orders complained of, and that his finding presents three questions of law. Each query, with its accompanying operative facts, will be separately stated and considered. The facts are found within the Commissioner's order, the transcript, a stipulation between counsel and record made. They are not in dispute.

**First:** Is a meat packing company "engaged in the business of operating cars for the transportation of freight" when it owns and uses refrigerator cars exclusively for making intercompany shipments of its own perishable products and for making deliveries of its products to customers?

Appellant is an Illinois corporation with its principal place of business located in Chicago. It purchases, slaughters and sells at wholesale and delivers its products to purchasers. It has 34 packing plants located strategically to sources of supply. It maintains 251 refrigerator warehouses located near consuming centers, five of which are located in Ohio. Its products are shipped in refrigerator cars from its packing houses to its branch houses and customers. It also makes distribution from its packing plants and branch houses to customers directly by refrigerated motor trucks. During the years 1912 to 1934 Armour built or acquired 4,635 refrigerator cars at a cost of $8,983,184.32 which it owned and possessed on April 30, 1946, and which had a book value of $1,130,383.54 on said date. This book value was produced by deduction from cost price of claimed depreciation and destroyed cars. Its rolling stock was never leased or loaned to any other enterprise, but was used solely in the distribution of its own products. Armour's investment in refrigerator cars on April

30, 1946, represented less than ½ of 1% of its total assets. Its total capital on May 1, 1946, as shown by its balance sheet, was $324,794,254.00. Armour and Company within itself maintains a division that is called Armour Car Lines which operates that branch of its business. It owns or owned considerable property, both real and personal, in Ohio in 1946 upon which it paid all taxes levied and assessed. This did not include, however, its refrigerator railroad cars. It had paid its franchise tax and was authorized to do business in Ohio. During 1946 its cars operated within and over and across the state. It made report of its rolling stock in 1946 as a freight line company.

Upon these facts appellant asserts that it was not engaged in the business of operating cars within the ordinary meaning of the language found in §5416 GC. It is said that its principal business and concern is the slaughtering of livestock and selling its packing house products at wholesale. It says that inter-company shipments and delivery to customers is but a fragmentary part of its packing business and that its refrigerator cars are mere tools of its trade and not subdivisions of its business. As a matter of precedent it relies almost entirely upon the reasoning and conclusion found in Southern Express Co. v. R. M. Rose Co., 124 Ga. 581. It, in substance, urges that it is one of three like enterprises (The Pullman Company and Wilson and Company), the latter of which owns and operates refrigerator cars in and across Ohio for its convenience and profit and which do not come within the scope, purpose, meaning and intent of the General Code sections under consideration. If this be true, then their migratory rolling stock (refrigerator cars) is not subject to this imposed tax in Ohio, but is tax exempt by reason of legislative omission. An examination of the Georgia case discloses that nothing said therein is responsive to the issue herein presented. Whatever is said in that case concerns the right, by ordinance, of a chartered city to ordain that delivery of liquor by a common carrier is a separate business subject to a license tax.

Sec. 5416 GC provides, in part, in paragraphs 1 and 6 thereof, that:

"**Any person** or persons, firm or firms, co-partnership or voluntary association, joint stock association, **company or corporation,** wherever organized or incorporated:

"**When engaged in the business of operating cars for the transportation of freight, whether such freight is owned by such company, or any other person or company, over any**

railway line or lines in whole or in part within this state, such line or lines not being owned, leased or operated by such company, whether such cars be termed box, flat, coal, or tank, stock, gondola, furniture or refrigerator cars, or by any other name, is a freight line company;" (Emphasis ours.)

Just because appellant owns its cars and carries its own freight as an adjunct of its principal business, it insists that it is not a freight line company amenable to the property tax upon its cars during their sojourn in Ohio. Ownership of car is not made the test. "Operating cars" is the term employed. One may operate his own cars as well as those belonging to another. Ownership of the freight carried is made immaterial. Is the fact that Armour's freight line or refrigerator car business is but ½ of 1% of its invested capital so fragmentary as to be inconsequential? If so, what percentage is the line of demarcation? As the question presented is a law question, the latter query cannot be answered by resort to the measuring stick known as the length of the chancellor's foot. What the statute says must bring forth the answer. It makes no percentage or degree of a company's activity in freight line business the test, but prescribes that all so engaged are freight line companies whether large or small. Some steel companies own and operate coal mines. Can it be that they are engaged only in steel production just because they may be pleased to say that their principal business is steel, not coal? Appellant is a 324 million dollar company, and even if it has but 2 million of its capital structure invested in refrigerator cars, that in itself, even in these times, is far from being an inconsiderable business. An organization may engage in numerous undertakings as is done by Standard Oil, DuPonts and Atlantic and Pacific, the latter of which the Federal Government would now disintegrate. The Farm Bureau sells insurance. Is it not in the insurance business just because its principal business is along other lines? Armour persists in its refrigerator car business. It must be advantageous and profitable in the accomplishment of its major purpose. It undoubtedly gives it an advantage over its competitors like Swift and Cudahay, who do not engage in refrigerator car ownership. We find no merit in appellant's first contention. It is, in its refrigerator car operation, a freight line company under the Ohio statutes.

The Board of Tax Appeals feels that questions two and three, as made by appellant, ought to be jointly considered. They will be so treated. If the second query be answered in the negative, the third is automatically answered.

Second: "If so (engaged in the business of operating cars for the transportation of freight), may the Tax Commissioner arbitrarily fix the number of cars owned and used in Ohio by rule of thumb (car mileage) when he has full and complete information as to the daily average number of cars in the state?"

Third: "May the Tax Commissioner lawfully certify to the Auditor of State for taxation, the value of cars owned and used in Ohio in lieu of certifying the amount and value of the proportion of the capital stock of the taxpayer represented by cars owned and used in the state?"

This Board has encountered considerable difficulty in determining the manner in which this phase of the controversy may be lucidly explained. It finds no other course than the one which is pursued, and to that end many nonoperative facts will be disregarded. Among other things, it is stated, in the order appealed from, that:

"On July 8, 1946, the applicant filed with the Tax Commissioner the statement required of freight line companies by §5462 GC. The Tax Commissioner determined that the amount and value of the proportion of the capital stock of Armour and Company representing capital and property owned and used in Ohio during the year ending April 30, 1946, was $176,912.00."

This report, found within the Commissioner's transcript, states that the total car miles of its cars everywhere was 143,263,720 miles, and of this figure 13,053,764 was the total mileage made by its cars in Ohio during the tax period. It reported that it owned 4684 cars from which 43 wrecked or junker cars were deducted, leaving a balance of 4641 refrigerator cars in its fleet. It also reported that 1372 of its cars were idle cars outside of Ohio that never entered the State during the tax year. The Tax Commissioner determined that appellant's entire fleet had a depreciated net worth of $1,952,339.07. To these figures the Commissioner applied the "car mileage" formula for ascertainment of taxable value of transitory property within a fixed determinable situs in accordance with the generally accepted practice in Ohio and elsewhere. This method or formula is worked out by dividing the total car mileage of 13,053,764 by the total car mileage everywhere of 143,263,720, which produced the figure of .091117025, which multiplied by the fleet's total net worth, of $1,941,393.07, produced the certified taxable figure of $176,-

912.00 for the tax year 1946. It will be perceived that this computation disregarded the taxpayer's report of 1372 cars that never entered Ohio during the taxing period. If these 1372 cars never entered Ohio during the taxing period they are not taxable in Ohio. This is in accordance with the prior holding of the Board of Tax Appeals made in American Refrigerator Transit Company v. Glander, (Affirmed **153 Oh St 191**) No. 15047 under date of 6/28/'49, and Union Tank Car Company v. Glander, No. 15041 under date of 7/13/'49. The taxpayer applied for a rehearing and redetermination, which the Tax Commissioner allowed.

Upon rehearing appellant produced evidence, found within the transcript and record, which establishes certain facts that are found by the Commissioner to be true and were by him carried into the final order now complained of. It was found that during the tax year Armour owned 4,635 refrigerator cars and that they had a book value of $1,130,383.54; that a daily average of 351 cars were in repair shops outside of Ohio; that a daily average of 196 were at Armour's packing plants outside of Ohio; that a daily average of 1147 cars were at Armour's packing plants outside of Ohio being loaded or waiting to be loaded, and that a daily average of 150 cars were at branch houses, unloading points or ports of export outside of Ohio being unloaded or awaiting unloading. These four figures produce a total of 1844 average number of cars that were daily outside of Ohio. The Commissioner further found that a daily average of 5.4 cars were at Armour's packing plant in Columbus, Ohio, being loaded or unloaded or awaiting unloading; and that a daily average of 10.6 cars were so engaged at all other Ohio points; and that all other Armour cars in Ohio, during the tax year, were traveling through the State en route from points outside of Ohio to points in Ohio, or from points in Ohio to points outside of Ohio, or to and from points outside of Ohio; that Armour's cars traveled a total of 143,263,720 miles, of which 13,053,764 miles were traveled in Ohio; and that the average rate of travel of Armour cars in Ohio during the tax year was 462.24 miles per car per day. The facts found and herein enumerated are evidenced by Armour and railroad officials and are in no way contradicted. At no place in this final entry is the total net worth figure of $1,941,593.00 to be found. The order concludes with an affirmance of the certification of a taxable value of $176,912.00 as made in the first instance.

In **Pullman Company v. Evatt**, **144 Oh St, 295, 29 O. O. 445,** the court had the Code sections herein in question under review and of which it was said, "A study of the provisions of

those sections demonstrates that the tax there imposed is not a franchise tax but a property tax." To the members of this Board it is beyond question that these sections of the Code were enacted for the evident purpose of taxing migratory property of corporations which temporarily found domicile within the State of Ohio during the course of a tax year, and while therein received protection, as does all other kinds of personal property; and that it might not escape from, but should bear its fair portion of the tax burden. The General Assembly well knew that in the absence of well kept records the number of cars of a freight line company temporarily domiciled within the State would be difficult of ascertainment and incapable of absolute certainty. To afford a means to the ends sought, §5465 GC and predecessor sections were enacted to establish a "track mileage" or other fair and just formula for the purpose of determining the number and value of such cars. It was never the legislative purpose to tax personal property within the State that had its domicile elsewhere because of the well known general rule, which needs no recitation of authorities in support thereof, that personal property is taxable only at its situs. Sec. 5465 GC created an exception to that rule in the formula or methods therein provided that have been approved of in Pullman Palace Car Co. v. Pennsylvania, 141 U. S. 18, 35 L. Ed. 613, and in the recent case of Ott v. Mississippi Valley Barge Line Co., Vol. 93-No. 8, page 431, L. Ed. advance sheets under date of February 28, 1949.

At this point attention ought to be directed to the case of **Floyd v. Light and Heat Co., 111 Oh St 57 (74 & 75)**, which is authority for two pertinent matters. It was therein held that the State has power to levy a tax upon property found within its borders which is used in interstate commerce and which the State is bound to and does protect while such transitory property is within its borders; and that a state does not have power, as a basis of taxation, to levy taxes upon property beyond the territorial boundaries of the State and that there must be no taxation of property not within the State.

Appellant asserts, from the facts proven and found, that the domicile time of its rolling stock within the State during the tax year 1946 is susceptible of definite ascertainment and that hence it does not come within the provisions of §5465 GC and is exempt from taxation. It has paid its franchise and real property taxes and taxes upon all of its personal property save its rolling stock. All personal property is taxable in Ohio save such as is excepted or exempted by statute. A

freight line company's rolling stock is not so excepted or exempted. **Sec. 5465 GC** taxes such property. Any formula, be it "daily average," "track mileage" or "car mileage," is not a rigid rule, but an elastic provision which permits taxation of property within the State, as is provided in §5468 **GC,** but recognizes that property which is situated elsewhere may not be taxed. **Sec. 5465 GC** says that "the commission (now Tax Commissioner) shall ascertain and determine the amount and value of the proportion of the capital stock of * * * freight line * * * companies, representing capital and property of such companies owned and used in this **state,** and in so determining shall **be guided** in each case by * * *" a formula. The comma appearing after the word "state" might just as well be a period. We direct particular attention to the word "guided," which is not synonymous with "governed" or other like words of command. If appellant has proved the situs of all of its cars within and without the State as claimed, as we think it has, then there is no necessity for the use of a formula and ascertainment of the taxable sum is but one of mathematical computation. In so far as appellant is concerned the statute might as well end at the word "state." Such is the finding of the Board of Tax Appeals. Appellant is not exempt from its proper ascertainable tax.

Appellant's book value of its fleet at $1,130,383.54, as claimed and found by the Tax Commissioner, is not the equivalent of its total present net value for taxation, as found by the Tax Commissioner, who ascertained that figure to be $1,-941,593.37. From the figures before us it is the judgment of the Board of Tax Appeals that appellant's tax for the year 1946 must be figured in the following way:

Take the total present net value of $1,941,593.37 of appellant's fleet, as found by the Tax Commissioner, and divide it by 4641 (the number of cars upon which it was computed) and the quotient of $418.35 produced represents the present net value per car for tax purposes, as found by the Commissioner. Next the daily average of appellant's cars in Ohio is to be established. It was found that 5.4 cars represented the daily average of cars loading or unloading in the Columbus yards. To this add 10.6 cars found to be the daily average of cars loading or unloading at points in Ohio other than Columbus. The result is 16, the daily average of stationary cars in Ohio. Next take the found speed of 462.24 miles per day of appellant's cars moving in Ohio and multiply this by 365 days in the year. The result obtained is 168,717 miles which one car would travel in a year's time. The sum of 168,717 miles per car per year divided into 13,053,764 (total Ohio mileage

for 1946) produces the figure of 77.37, the daily average of cars in motion. Add to this the 16 stationary cars' daily average in Ohio, which makes 93.37 the total number of car proportion in Ohio. At $418.35 (present net value per car) times 93.37 (the daily average number of cars) the sum of $39,061.34, which represents the figure that should have been certified to the auditor of state for taxation, is produced instead of the sum of $176,912.00.

The order appealed from is so modified, and affirmed as modified; and the cause is remanded to the Tax Commissioner for further certification.